No. 96,461

GARY NINEMIRE and TIFFANY NINEMIRE, *Appellants,* v. KANSAS DEPARTMENT OF SOCIAL AND REHABILITATION SERVICES, *Appellee.*

(162 P.3d 22)

*J. Eugene Balloun,* of Shook, Hardy & Bacon, LLP, of Overland Park, argued the cause, and *Amy S. Merritt,* of Merritt Law Office, of Olathe, was with him on the brief for the appellants.

*Roberta Sue McKenna,* of Kansas Department of Social and Rehabilitation Services, of Topeka, argued the cause, and *Paula B. Hurt,* of the same agency, was with her on the brief for the appellee.

The opinion of the court was delivered by

ROSEN, J.: This case involves the amount of a monthly adoption subsidy payment to be made by the Secretary of Social and Rehabilitation Services (SRS) on behalf of a former foster child. SRS determined the child was eligible for federal adoption assistance and authorized a subsidy payment but set the amount at $0 because the child did not currently exhibit any special needs. The adoptive parents bring this appeal, seeking a monthly payment equal to the foster care payments they received before adopting the child.

C.L.N. was born in September 2002. C.L.N. tested positive for cocaine at the time of her birth but did not require admission to the neonatal intensive care unit and did not receive any specialized treatment after her birth due to the cocaine. SRS immediately placed C.L.N. in protective custody. When C.L.N. was 5 days old, SRS placed C.L.N. in foster care with Gary and Tiffany Ninemire, whose family included three children, ages 11, 10, and 8. SRS paid the Ninemires $540 per month as a foster care payment for C.L.N.

C.L.N.'s birth parents relinquished their parental rights nearly 1 year after C.L.N.'s birth. The Ninemires expressed an interest in adopting C.L.N. and requested a monthly adoption assistance subsidy, stating that they had promised their other three children that they would not have to sacrifice anything except space and some parenting time. The Ninemires submitted a family budget as part of their home study during the adoption process.

The Ninemires had C.L.N. evaluated when C.L.N. was 13 months old because they were concerned about C.L.N.'s self-calming behaviors like rocking, moaning, toe-walking, and hitting her head. After performing standardized testing to assess C.L.N.'s development, the evaluator concluded that C.L.N. was developing within normal limits. However, because the Ninemires expressed concerns regarding C.L.N.'s sensory processing, the evaluator recommended that C.L.N. receive services from Lakemary Center Infant-Toddler Program. Medicaid covered the cost of those services.

When C.L.N. was 16 months old, a social worker conducted an evaluation for C.L.N.'s adoptive placement and reported that C.L.N. was developmentally on target with no social or emotional problems. The social worker described C.L.N. as a "happy, healthy little girl who loves to smile and be held" and concluded that C.L.N. "is developing normally. She may need extra help with sensory problems and speech, but that is all this worker is aware of currently."

The Ninemires met with SRS social workers on May 28, 2004, to finalize an adoption assistance agreement on behalf of C.L.N. SRS determined that C.L.N. was eligible for assistance under Title IV-E, 42 U.S.C. §§ 670 *et seq.* (2000), the federal adoption assistance program, based on the "guarded prognosis" category. The "guarded prognosis" category applies to children who are not being treated for a specific disability but may develop one due to factors in the child's background. Based on this determination, SRS and the Ninemires entered into an adoption assistance agreement, which provided that the Ninemires would receive a Title XIX Medicaid insurance card for C.L.N. and a nonrecurring payment of $550 to cover adoption expenses. The parties also agreed that C.L.N. was eligible for a monthly adoption assistance payment but set the amount of the monthly subsidy at $0 because there were no special needs identified to justify a monthly subsidy at that time.

In August 2004, the Ninemires requested an administrative hearing to increase the amount of C.L.N.'s monthly adoption subsidy from $0 to $540 per month. The Ninemires submitted a revised budget, which did not include any expenditures specifically

for C.L.N. Following a hearing, an administrative hearing officer affirmed the monthly subsidy amount of $0, as agreed upon by the parties in the adoption assistance agreement.

After finalizing C.L.N.'s adoption in October 2004, the Ninemires appealed the hearing officer's decision to the State Appeals Committee. When the State Appeals Committee affirmed the hearing officer's decision, the Ninemires filed a petition for review of the agency's action in the district court. The district court affirmed the agency's action. The Ninemires then appealed the district court's decision to the Court of Appeals. However, before the Court of Appeals heard the case, we transferred it to this court on our own motion pursuant to K.S.A. 20-3018(c).

The Ninemires assert that the district court erroneously interpreted the law when it concluded that SRS did not have to pay them a monthly adoption subsidy on behalf of C.L.N. The Ninemires raise three arguments. First, the Ninemires argue that the district court misinterpreted the requirements for eligibility under federal statutes. Second, the Ninemires argue that the district court misinterpreted the purpose for the federal adoption assistance statutes. Third, the Ninemires argue that the district court misinterpreted the law when it found that C.L.N. did not have any special needs.

We will not address the Ninemires' first and second arguments because there is no dispute between the parties. Both parties agree that C.L.N. qualifies as a special needs child pursuant to Title IV-E, the federal adoption assistance program. See 42 U.S.C. § 673(c) (2000). Likewise, both parties agree that the adoption assistance program was enacted to encourage the adoption of children with special needs by providing ongoing financial and medical assistance to the families who adopt them.

To resolve this matter, we turn our focus to the Ninemires' third argument, that the district court misinterpreted the law when it concluded that C.L.N. did not have any special needs. Resolution of this issue involves the review of an agency action. An appellate court's review of an agency action is subject to the Kansas Act for Judicial Review and Civil Enforcement of Agency Actions, K.S.A. 77-601 *et seq.* See K.S.A. 2006 Supp. 77-603; *Sokol v. Kansas Dept.*

*of SRS*, 267 Kan. 740, 745, 981 P.2d 1172 (1999). An appellate court reviews an administrative agency's decision using the same standard as the district court. *Sokol*, 267 Kan. at 746. Although K.S.A. 77-621(c) limits the review of an agency action, it authorizes courts to review the agency's interpretation or application of law. See K.S.A. 77-621(c)(4). The interpretation of a statute is a question of law subject to unlimited review. *Fieser v. Kansas Bd. of Healing Arts*, 281 Kan. 268, 270, 130 P.3d 555 (2006). Under the doctrine of operative construction, courts have given deference to an administrative agency's interpretation of a statute it has been charged with enforcing. "However, '[t]he final construction of a statute [always] rests within the courts.' " 281 Kan. at 270 (quoting *In re Tax Exemption Application of City of Wichita*, 255 Kan. 838, 842, 877 P.2d 437 [1994]).

The Ninemires essentially argue that C.L.N. is entitled to a monthly adoption assistance payment by virtue of her eligibility under Title IV-E as a special needs child, regardless of whether C.L.N. actually has any special needs demanding spending. The Ninemires have characterized Title IV-E subsidies as "open ended entitlements," which provide C.L.N. with an absolute right to a benefit, granted immediately upon meeting the statutory requirements. In addition, the Ninemires argue that the district court erred when it concluded that C.L.N. did not have any special needs, because the federal policies for implementing the statutes include ordinary needs for children who qualify.

Title IV-E authorizes the federal government to appropriate money to states for the purpose of "enabling each State to provide . . . adoption assistance for children with special needs." 42 U.S.C. § 670. 42 U.S.C. § 673(a)(1)(A) requires a State to enter into an adoption assistance agreement with the adoptive parents of special needs children. An adoption assistance agreement is a "written agreement, binding on the parties to the agreement, between the State agency, other relevant agencies, and the prospective adoptive parents of a minor child." 42 U.S.C. § 675(3) (2000). The agreement must specify "the nature and amount of any payments, services, and assistance to be provided" under the agreement. 42 U.S.C. § 675(3). 42 U.S.C. § 673(a)(1)(B) establishes the types of

payments to be included in the adoption assistance agreement, providing:

"(B) Under any adoption assistance agreement entered into by a State with parents who adopt a child with special needs, the State—

(i) *shall* make payments of nonrecurring adoption expenses incurred by or on behalf of such parents in connection with the adoption of such child, directly through the State agency or through another public or nonprofit private agency, in amounts determined under paragraph (3), and

(ii) in any case where the child meets the requirements of paragraph (2)[defining children eligible for a monthly payment], *may* make adoption assistance payments to such parents, directly through the State agency or through another public or nonprofit private agency, in amounts so determined." (Emphasis added.)

In addition to paying for nonrecurring expenses associated with the adoption, the State must provide health insurance coverage for special needs children subject to an adoption assistance agreement. 42 U.S.C. § 671(a)(21) (2000); 42 U.S.C. § 673(a)(1)(B).

42 U.S.C. § 673(a)(3) establishes the method for determining the amount of the nonrecurring or monthly payments, providing:

"The amount of the payments to be made in any case under clauses (i) and (ii) of paragraph (1)(B) shall be determined through agreement between the adoptive parents and the State or local agency administering the program under this section, which shall take into consideration the circumstances of the adopting parents and the needs of the child being adopted, and may be readjusted periodically, with the concurrence of the adopting parents (which may be specified in the adoption assistance agreement), depending upon changes in such circumstances. However, in no case may the amount of the adoption assistance payment made under clause (ii) of paragraph (1)(B) exceed the foster care maintenance payment which would have been paid during the period if the child with respect to whom the adoption assistance payment is made had been in a foster family home."

The parties do not dispute that C.L.N. qualifies pursuant to Title IV-E as a special needs child or that she is eligible to receive a monthly subsidy pursuant to 42 U.S.C. § 673(a)(1)(B)(ii). The only issues are whether 42 U.S.C. § 673(a)(1)(B)(ii) requires a monthly subsidy payment simply because C.L.N. is eligible, and what the amount of any monthly subsidy payment must be.

Although the State is required to pay for nonrecurring adoption expenses, the State is not required to provide a monthly subsidy. 42 U.S.C. § 673(a)(B)(i) uses the phrase "shall make payments of

nonrecurring adoption expenses," indicating that these payments are required. However, 42 U.S.C. § 673(a)(1)(B)(ii) uses the phrase "may make adoption assistance payments," indicating that states are authorized to make monthly subsidy payments but not required to make such payments. Therefore, the Ninemires' argument that C.L.N. should receive an adoption assistance subsidy merely because she is eligible has no merit.

Even though a monthly subsidy was not required, SRS authorized a monthly subsidy, and the parties agreed to set the amount of the subsidy at $0. The Ninemires now argue that the amount should be the same as their monthly foster care payment to defer C.L.N.'s ordinary expenses. According to the Ninemires, SRS misinterpreted the law because its guidelines are not consistent with the federal guidelines for determining the amount of an adoption subsidy payment.

If the State authorizes a monthly adoption assistance payment, the Child Welfare Policy Manual (2007) issued by the United States Department of Health and Human Services provides direction for negotiating the amount of the monthly payment. States cannot rely only on the financial means of the adoptive parents. Rather, the State must consider the circumstances of the adopting parents together with the child's needs when negotiating the adoption assistance agreement. Consideration of the circumstances of the adopting parents pertains to the adopting family's capacity to incorporate the child into their household "in relation to their lifestyle, standard of living and future plans, as well as their overall capacity to meet the immediate and future needs (including educational) of the child." Child Welfare Pol. Man. § 8.2A.2, question 1 (2007). The agreed-upon payment "should combine with the parents' resources to cover the ordinary and special needs of the child." Child Welfare Pol. Man. § 8.2D.4, question 1.

K.S.A. 38-321 authorizes SRS to establish rules and regulations as necessary for administering the adoption assistance program. SRS has set forth its policies for determining the amount of an adoption assistance subsidy in the Children and Family Services— Policy and Procedure Manual (2007) (CFS Manual). According to the CFS Manual, SRS must review the family budget and any in-

formation regarding other resources available to the family to help determine what portion of the cost of the child's needs the family can meet. CFS Manual § 6240(C). However, the CFS Manual specifically notes that adoption assistance is different from foster care because it is not intended to "reimburse the family for the total costs for caring for the child." CFS Manual § 6240(A). When determining whether to provide monthly subsidy payments, SRS expects "that the family will assume the responsibility for expenses like food, clothing, shelter, entertainment, etc." CFS Manual § 6252. The CFS Manual lists the following factors for consideration when determining the amount of any subsidy:

"Cost of medical transportation;
"Cost of adding child to private health insurance;
"Special equipment or other non-medical supplies needed by the child not covered through other resources (*e.g.*, disposable diapers for children past toilet training age, non-prescription medication recommended by the doctor, etc.);
"Cost of day care;
"Number of children in the sibling group to be adopted; (In certain situations where families are adopting large sibling groups, the added cost of food, clothing, and shelter may be taken into consideration when arriving at a subsidy amount.);
"Costs of special 'enrichment' programs to benefit the child;
"Other costs unique to the needs of the child;
"Home improvements required due to the child's special needs." CFS Manual § 6252(A).

SRS determined that C.L.N. did not have any physical, emotional, or mental disabilities at the time of her adoption, and the Ninemires do not assert that C.L.N.'s sensory processing concerns qualify as physical, emotional, or mental disabilities. Because C.L.N. did not have any disabilities at the time of her adoption, SRS concluded that C.L.N. was eligible for Title IV-E adoption assistance based on a guarded prognosis. According to the CFS Manual, a guarded prognosis applies to children who are not currently being treated for a specific disability or condition but circumstances in the child's genetic, health, and/or social background indicate that the child may develop physical, emotional, or developmental problems in the future. CFS Manual § 6210(C). When eligibility is based on a guarded prognosis, the monthly payment may be set at $0, giving the adoptive parents an opportunity to

request an increase in the amount of the subsidy if the child's needs change or the adoptive parents' ability to meet those needs changes. CFS Manual §§ 6210(C), 6252, and 6263.

As the Ninemires point out, the SRS guidelines are not aligned with the federal guidelines for determining the amount of a monthly adoption assistance subsidy. While the federal guidelines consider the family's overall capacity to pay for the child's ordinary and special needs equally, the CFS Manual emphasizes the child's special needs and gives little, if any, consideration to the child's ordinary needs. Nevertheless, in this case, our decision is unaffected by the differences between the federal and state guidelines because the procedure employed by SRS comported with the more generous federal model.

The federal guidelines require SRS to consider the circumstances of the adopting parents and the child's needs. Child Welfare Pol. Man. § 8.2A.2, question 1. The Ninemires submitted two budgets for consideration. Neither budget demonstrated a deficiency due to the adoption of C.L.N. In addition, the Ninemires agreed that C.L.N. did not have any special needs requiring additional spending at that time. SRS considered the Ninemires' circumstances when it negotiated a monthly subsidy of $0, but made renegotiation of the amount possible if C.L.N. develops special needs or the Ninemires' circumstances change. This complies with the federal guidelines, which require the agreed-upon payment to combine with the parents' resources to cover the child's ordinary and special needs. Although the CFS Manual emphasizes the child's special needs, here SRS considered all of the circumstances including the Ninemires' capacity for incorporating C.L.N. into their household. Thus, SRS's decision to deny the Ninemires' request for an increase in the monthly subsidy comports with both the federal and the state guidelines, and we find no error.

Although the district court based its decision on the state model of only considering a child's special needs, the result is the same under the federal guidelines. Therefore, we need not reach the question of whether SRS's policy manual complies with federal law. We affirm the district court's decision. See *Drake v. Kansas Dept. of Revenue*, 272 Kan. 231, 239, 32 P.3d 705 (2001) (when a district

court reaches the correct result, the appellate court will uphold the decision).

Affirmed.